# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-20-00164-CR

---

**Ronald James Bias, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 264TH DISTRICT COURT OF BELL COUNTY
### NO. 79836, THE HONORABLE PAUL L. LEPAK, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Ronald James Bias was convicted of two counts of aggravated sexual assault of a child and sentenced to seventeen years' imprisonment in each count to be served consecutively. *See* Tex. Penal Code §§ 12.32, 22.021. On appeal, Bias contends that the trial court improperly allowed the outcry witness to testify and that his punishment should have been assessed under the statute governing indecency with a child. We will affirm the trial court's judgments of conviction.

## BACKGROUND

Bias was arrested and charged with committing aggravated sexual assault against his stepdaughter J.B., who was younger than fourteen years of age, by intentionally and knowingly causing J.B.'s sexual organ to contact his sexual organ and causing J.B.'s mouth to contact his sexual organ. *See* Tex. Penal Code § 22.021. A year before trial, the State designated

Alexandria Wright as an outcry witness, and an outcry-witness hearing was held before the jury was sworn in. *See* Tex. Code Crim. Proc. art. 38.072. Additionally, Bias was provided a copy of J.B.'s forensic interview over a year before trial.

During the outcry-witness hearing, Wright testified that she used to watch J.B. and her younger sister while her mother and stepfather were at work. Next, Wright explained that J.B. told her that Bias would ask her and her sister to take their "panties off and whoop us." Wright was concerned by this information and asked follow-up questions. J.B. related to her that when her mother was working at night and her sister was sleeping, Bias would wake her up, insert his penis into her mouth, and tell her to "suck it like a lollypop." Wright testified that J.B. described "yucky stuff" coming "out . . . of the penis." Wright related that J.B. informed her that Bias would also "put his penis in her butt" and "in [her] vagina and that hurt," made her vagina bleed during one of those encounters, and after noticing the blood, told her to "clean up and get ready for school." Wright testified that J.B. told her that Bias threatened to kill her mother and her sister if she told anyone about the incidents. Regarding the allegations, Wright testified that J.B. stated that she had never told anyone before making her outcry to Wright, and Wright explained that she felt like J.B. was disclosing a secret that she had never told anyone. At the end of the hearing, the trial court overruled Bias's hearsay objection to Wright's testimony and authorized Wright to testify as an outcry witness.

During the trial, Wright testified consistently with her testimony from the outcry-witness hearing. Wright also testified that J.B. made her outcry approximately two weeks after Bias had moved out of the house. In addition, Wright related that J.B. told her that Bias would make her "hold his penis and go up and down on his penis until that yucky stuff came out." Wright stated that she told J.B.'s mother about the abuse and that they took J.B. to a children's

2

hospital to be examined. The hospital staff informed them that the hospital could not perform an acute exam because too much time had passed since the last incident, and the hospital staff provided them with information about setting up a forensic examination, which was conducted about a week later.

The sexual-assault-nurse examiner (SANE) who examined J.B. testified regarding the examination and J.B.'s statements during the exam. The SANE testified that J.B. described "oral penetration" and "penetration to the female sex organ" and described Bias forcing her to "suck his private part" more than once and ejaculating in her mouth. The SANE testified that J.B. stated that Bias put "his private . . . inside" her more than once while pointing at her genitalia and that he would punch her and hit her with a belt during these assaults. The SANE further testified that she saw no evidence of abuse but also explained that it is uncommon to find evidence when there is a significant delay between the examination and the last incident of abuse because the involved body areas heal quickly.

J.B.'s mother testified that she had decided to divorce Bias before learning of the allegations, that Bias was the caregiver for her children while she was at work, that she often worked in the morning and at night, and that J.B. was eight or nine when she made her outcry to Wright. Next, one of the detectives involved in the case testified that no physical evidence was collected in the case and that she arranged for a forensic interview of J.B. During the interview, J.B. described more than one incident of sexual assault and mentioned that the incidents occurred while her mother was at work. The forensic interviewer testified that J.B. could tell the difference between the truth and a lie and was able to relate the events coherently.

Finally, J.B. was called to the stand, testified that Wright was the first person whom she had told about the abuse, and described the following incidents of abuse:

3

Bias touched her "private area" with his hands when she was eight years old;

Bias came in her room, took his clothes off, made his "private part" touch hers, and then spanked her sister for trying to enter the room while this was going on;

Bias told her to get on top of him, removed his pants, and made her rub his "private area" with her hands before "white stuff came out" of his "private area";

Bias took off his pants and told her "to suck his private part like a popsicle," and something "white" went into her mouth; and

Bias's "private part" touched the "inside" of her "private part" and that this incident hurt.

During Bias's case-in-chief, he offered, and the trial court admitted, a copy of J.B.'s forensic interview. In addition, Bias called his uncle Conrad Bias as a witness, who testified that he watched J.B. and her sister for several months while Bias and J.B.'s mother were both working and that the children seemed to love Bias.

After considering the evidence, the jury convicted Bias of the two charged counts of aggravated sexual assault. Bias appeals his convictions.

## DISCUSSION

In his first issue on appeal, Bias contends that his "rights of confrontation, due process[,] and due course of law were violated by the State's use of . . . Wright as an outcry witness, given that she was not the first person J.B. told about the purported offense conduct." In his second issue on appeal, Bias asserts that "the aggravated sexual assault of a child statute under which [he] was charged . . . is in pari materia with the indecency with a child statute," since they address the same subject matter, and therefore that he "should have been punished under the indecency with a child statute."

4

**Outcry Witness**

When asserting that Wright was not the proper outcry witness, Bias points to the forensic-interview recording that was admitted into evidence at his request. During her interview, J.B. stated that the first person whom she told about the abuse was "Grandma Brenda" and that she told both of her grandmothers about it. After highlighting J.B.'s statement, Bias argues that the State knowingly sponsored the wrong outcry witness to testify about the abuse and analogizes the State's actions to the presentation of false testimony. Bias emphasizes that the State knew about J.B.'s statement in her interview because the State gave him a copy of the interview and because a police officer observed the interview. Further, Bias urges that the State was required to comply with the directive of article 38.072 of the Code of Criminal Procedure allowing only the first person to whom a victim makes an outcry to testify as an outcry witness. *See* Tex. Code Crim. Proc. art. 38.072. Moreover, Bias contends that designating Wright as the person to whom J.B. made her outcry provided the jury with a false impression. In his briefing, Bias contends that the State's actions violated his rights to due process and due course of law. *See* U.S. Const. amend. XIV; Tex. Const. art. I, § 19. Relatedly, Bias argues that the State's actions deprived him of the right to confront the witnesses against him. *See* U.S. Const. amend. VI; Tex. Const. art. I, § 10.[1]

---

[1] In its brief, the State contends that Bias's claims are multifarious and may be rejected on that basis. *See Davidson v. State*, 249 S.W.3d 709, 717 n.2 (Tex. App.—Austin 2008, pet. ref'd) (explaining that issue containing "more than one specific ground of error is a multifarious one" and that appellate courts "may refuse to consider it"); *see also Buntion v. State*, 482 S.W.3d 58, 105 n.16 (Tex. Crim. App. 2016) (deciding not to address claim that rendered defendant's "point of error multifarious"); *McCambridge v. State*, 712 S.W.2d 499, 502 (Tex. Crim. App. 1986) (advising attorneys to carefully separate federal and state constitutional claims or risk issue being overruled "as multifarious"). To the extent that these arguments are multifarious, we address them in the interests of justice. *See Davidson*, 249 S.W.3d at 717 n.2 (explaining that appellate

We note that even though Bias offered the recording of J.B.'s interview during his case-in-chief and even though it was admitted into evidence and played for the jury, he made no objection asserting any of the grounds he urges on appeal. *See* Tex. R. App. P. 33.1(a) (setting out procedure for preserving issues for appellate consideration). Even assuming Bias's arguments could be addressed for the first time here, we would be unable to sustain this issue. To succeed on a claim that a defendant's due-process rights were violated because of the State's use of false testimony, the testimony used by the State must have been false and must have been material to a defendant's conviction, meaning "there is a reasonable likelihood that the false testimony could have affected the judgment of the jury." *Ex parte Robbins*, 360 S.W.3d 446, 459 (Tex. Crim. App. 2011) (internal citation omitted). Here, Bias does not assert that Wright's testimony about the allegations was false; instead, he argues that Wright was not the proper outcry witness and that her designation as the outcry witness provided the jury with a false impression. We have been unable to find authority for the proposition that the use of an allegedly improper outcry witness in these circumstances constitutes the use of false testimony by the State.

Moreover, given the state of the record on this issue, it is unclear how this Court could decide whether Wright was not the proper outcry witness or whether her designation improperly provided any false impression to the jury. *See Smith v. State*, 459 S.W.3d 707, 712 (Tex. App.—Texarkana 2015, pet. ref'd) (overruling issue asserting that another person should have been outcry witness based on victim's statement in forensic interview because defendant "presented no evidence to the trial court establishing that any other person would have qualified in that capacity"). In the more typical situation, such as the cases on which Bias relies, the

courts "may consider multifarious issues if [they] can determine, with reasonable certainty, the alleged error about which the complaint is made").

6

record has been developed either through a hearing on a motion for new trial or a habeas proceeding,[2] but that has not occurred here. Bias has identified an inconsistency between Wright's testimony at the outcry-witness hearing that she was the first person to whom J.B. made an outcry and J.B.'s forensic-interview statement that the first person whom she told about the abuse was her grandmother; however, that inconsistency alone would not compel a conclusion that Wright was not a proper outcry witness or that her designation as the outcry witness somehow rendered her testimony false or misleading. *Cf. id.* at 711 n.7 (noting that child's "generalities and imprecisions in reciting chronological order can be understood").

Although article 38.072 specifies that an outcry statement is admissible if it is "made to the first person . . . to whom the child . . . made a statement about the offense," Tex. Code Crim. Proc. art. 38.072, the Court of Criminal Appeals has explained that the provision refers to the first adult "to whom the child makes a statement that in some discernible manner describes the alleged offense," *Garcia v. State*, 792 S.W.2d 88, 91 (Tex. Crim. App. 1990). In other words, "the statement must be more than words that give a general allusion that something in the area of sexual abuse was going on." *Id.* In general, the proper outcry witness is the first adult to whom the alleged victim relates "how, when, and where" the abuse occurred. *See Reyes v. State*, 274 S.W.3d 724, 727 (Tex. App.—San Antonio 2008, pet. ref'd) (quoting *Hanson v. State*, 180 S.W.3d 726, 730 (Tex. App.—Waco 2005, no pet.)). In cases where a child has allegedly been the victim of more than one act of sexual abuse, multiple outcry witnesses may

---

[2] *See, e.g.*, *United States v. Agurs*, 427 U.S. 97, 100, 114 (1976) (motion for new trial); *Giglio v. United States*, 405 U.S. 150, 151, 154-55 (1972) (same); *Napue v. Illinois*, 360 U.S. 264, 265, 267, 269, 272 (1959) (habeas proceeding); *Goodwin v. Johnson*, 132 F.3d 162, 185, 186 (5th Cir. 1997) (same); *Ex parte Ghahremani*, 332 S.W.3d 470, 476, 478 (Tex. Crim. App. 2011) (same); *Ramirez v. State*, 96 S.W.3d 386, 393, 394, 395-97 (Tex. App.—Austin 2002, pet. ref'd) (motion for new trial).

testify about separate acts of abuse committed by the defendant against the child. *Lopez v. State*, 343 S.W.3d 137, 140 (Tex. Crim. App. 2011). Accordingly, it is possible that Wright may have been the proper outcry witness even if J.B. first generally told her grandmother that she had been abused but provided the "how, when, and where" only to Wright or that there might have been two or more individuals who could have testified as permissible outcry witnesses. Moreover, we note that Wright's testimony regarding the allegations and regarding her being the first person to whom J.B. made an outcry was corroborated by J.B.'s testimony at trial. *Cf. Harm v. State*, 183 S.W.3d 403, 409 (Tex. Crim. App. 2006) (determining that records were not material where victim's testimony was corroborated by her mother and police officer).

For these reasons, we would be unable to determine on this record that Bias's due-process rights were violated, and Bias has provided no authority that the due-course-of-law provision under the Texas Constitution provides greater protection than the Due Process Clause does in these circumstances. *Cf. Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009) (holding "that, by failing to distinguish the rights and protections afforded under the Texas due course of law provision from those provided under the Fourteenth Amendment before the trial judge in this context, Pena failed to preserve his complaint that the due course of law provides greater protection for appellate review"); *Black v. State*, 26 S.W.3d 895, 896 n.4 (Tex. Crim. App. 2000) (failing to address constitutional claim where defendant "offer[ed] no reasons for construing the Texas Constitution as conferring greater protection . . . than the federal constitution").

Turning to Bias's assertion that his confrontation rights were violated in this case, that argument is similarly premised on his contentions that the State called the wrong outcry witness and that, therefore, the witness's testimony was false; however, as explained above, we cannot make this determination on the record before this Court. Moreover, we note that Bias had

8

the opportunity to fully cross-examine all of the State's witnesses, including Wright and J.B. Accordingly, we would be unable to determine on this record that Bias's confrontation rights were violated.

In his brief, Bias points to a case involving a confrontation claim that made its way through the appellate process multiple times. In *Sanchez v. State*, Angela Newsome testified during a pretrial hearing about the victim's outcry statement, but Newsome did not testify at trial because she became unavailable; instead, the trial court allowed her pretrial testimony to be read to the jury, and our sister court determined that this did not violate Sanchez's confrontation rights. 335 S.W.3d 256, 260, 263, 264 (Tex. App.—San Antonio 2010), *rev'd* 354 S.W.3d 476 (Tex. Crim. App. 2011). On appeal, the Court of Criminal Appeals determined that because the court in an article 38.072 hearing considers the narrow issue of the reliability of the outcry based on time, content, and circumstances of the statement, "the credibility of the outcry witness is not a relevant issue" at the hearing and, therefore, that the hearing "provides a defendant with an inadequate opportunity to cross-examine an outcry witness's credibility." *Sanchez*, 354 S.W.3d at 487, 488, 489. Accordingly, the Court determined that admitting the testimony from an article 38.072 hearing if the witness becomes unavailable violates the defendant's confrontation rights. *Id.* at 489. On remand, our sister court of appeals performed a constitutional-harm analysis and determined that the error in admitting the pretrial testimony from Newsome was not harmless. *Sanchez v. State*, 383 S.W.3d 211, 215, 216-17 (Tex. App.—San Antonio 2012, no pet.).

However, we believe that this line of cases is distinguishable. In this case, Wright was designated as the outcry witness during the hearing and testified about the events at trial. Accordingly, the type of confrontation issue present in *Sanchez* is not present here. Moreover,

9

although Bias likens the factors that our sister court considered on remand in its harm analysis to the circumstances present here, we do not address the issue of harm because we cannot conclude that there was a confrontation-clause violation based on this record.

For these reasons, we overrule Bias's first issue on appeal.

**Aggravated Sexual Assault Statute and Indecency with a Child Statute**

In his second issue on appeal, Bias argues that although he was charged with aggravated sexual assault, he should have been sentenced under the statute governing the offense of indecency with a child by contact. When presenting this issue on appeal, Bias notes that although the indictment originally alleged that he committed aggravated sexual assault by intentionally and knowingly causing "the sexual organ of [J.B.] . . . to contact or penetrate" his sexual organ and causing "the mouth of [J.B.] . . . to contact or penetrate" his sexual organ, the trial court granted the State's request to amend the indictment before trial by removing the phrase "or penetrate" from both counts. *See* Tex. Penal Code § 22.021(a)(1)(B)(iii), (v). In light of the amendments, Bias argues that the indictment alleged conduct falling under the indecency statute and, therefore, that the aggravated sexual assault statute under which he was charged is in pari materia with the indecency statute. *See id.* § 21.11. Further, Bias contends that because the indecency statute is the more specific statute, he "has a due process right and a due course of law right to be prosecuted under the more specific statute that is *in pari materia* with a broader statute."

We note that Bias presented no in pari materia argument to the trial court and did not assert that he should have been sentenced under the indecency statute. Generally, before a party may present "a complaint for appellate review, the record must show that . . . the complaint

10

was made to the trial court by a timely request, objection, or motion" and that "the trial court . . . ruled on the request, objection, or motion, either expressly or implicitly" or "refused to rule on the request, objection, or motion, and the complaining party objected to the refusal." *See* Tex. R. App. P. 33.1(a). Preservation of error is a "systemic requirement" on appeal. *See Darcy v. State*, 488 S.W.3d 325, 327 (Tex. Crim. App. 2016). "An appellant fails to preserve error by failing to object when he had the opportunity." *Burt v. State*, 396 S.W.3d 574, 577-78 (Tex. Crim. App. 2013). "To avoid forfeiting a complaint on appeal, the party must 'let the trial judge know what he wants, why he thinks he is entitled to it, and to do so clearly enough for the judge to understand him at a time when the judge is in the proper position to do something about it.'" *Pena*, 285 S.W.3d at 464 (quoting *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992)). Appellate courts should not address the merits of an issue that has not been preserved for appellate consideration. *See Blackshear v. State*, 385 S.W.3d 589, 591 (Tex. Crim. App. 2012).

Regarding claims asserting that two statutes are in pari materia, the Court of Criminal Appeals has more than once considered whether those claims were properly preserved for appellate consideration before addressing them. *See, e.g.*, *Diruzzo v. State*, 581 S.W.3d 788, 797-98 (Tex. Crim. App. 2019) (setting out how in pari materia claim had been preserved before addressing claim); *Azeez v. State*, 248 S.W.3d 182, 193-94 (Tex. Crim. App. 2008) (noting how defendant preserved "his *in pari materia* argument" by presenting argument to trial court in motion to quash, motion for directed verdict, and motion for new trial).

Additionally, one of our sister courts of appeals addressing an argument similar to Bias's here concluded that the defendant's complaint asserting that the Penal Code provision under which she was convicted was "*in pari materia* with a special statute of similar purpose providing for a lesser punishment" "has been waived because it was not brought to the trial

11

court's attention until appellant filed her amended motion for new trial." *Rodriguez v. State*, 336 S.W.3d 294, 301 (Tex. App.—San Antonio 2010, pet. ref'd); *see Short v. State*, 995 S.W.2d 948, 953 (Tex. App.—Fort Worth 1999, pet. ref'd) (concluding that defendant "waived her complaint" that she should have been charged under different statute because section 38.11 of Penal Code and section 482.002 of Health and Safety Code were in pari materia); *see also Haley v. State*, No. 05-11-01297-CR, 2013 WL 222275, at *5 (Tex. App.—Dallas Jan. 14, 2013, pet. ref'd) (op., not designated for publication) (concluding that defendant "has waived any claim on appeal that" aggravated-sexual-assault statute and indecency statute "were *in pari materia*" because he did not request any relief from trial court).

In his brief, Bias acknowledges that he made no argument to the trial court that he should have been sentenced under the indecency statute instead of the aggravated-sexual-assault statute based on the doctrine of in pari materia. However, he urges this Court to consider the issue "nonetheless based on the Supreme Court's holdings in *Class v. United States*." *See* 138 S. Ct. 798 (2018). However, we do not believe that *Class* compels a conclusion that Bias may present his second issue on appeal even though he did not present his complaints to the trial court. *See* Tex. R. App. P. 33.1. *Class* addressed whether a defendant can appeal his conviction after entering a plea agreement and pleading guilty by challenging the constitutionality of the statute criminalizing the conduct that he admitted committing when the plea agreement did not specify whether that issue had been waived. 138 S. Ct. at 803-05. *Class* did not address whether a defendant may present for the first time on appeal a claim that he should have been punished under a statute in pari materia with the statute forming the basis for his conviction. *See Al Bahlul v. United States*, 967 F.3d 858, 875, 876 (D.C. Cir. 2020) (noting that holding in *Class* "was relatively narrow," only addressed "the effect of pleading guilty," and did not address forfeiture

12

of claims and rejecting assertion that *Class* "fundamentally changed the law of forfeiture"); *see also United States v. Rios-Rivera*, 913 F.3d 38, 42 (1st Cir. 2019) (reasoning that failure to challenge constitutionality of statute before trial court "effects a forfeiture, even after *Class*"). Moreover, to the extent that Bias frames his issue as violating his due-process rights and his due-course-of-law rights, even those constitutional rights may be forfeited if not presented to a trial court. *Pena*, 285 S.W.3d at 464 (concluding that defendant failed to preserve "his due course of law provision claim"); *Hull v. State*, 67 S.W.3d 215, 216-18 (Tex. Crim. App. 2002) (determining that defendant failed to preserve due-process complaint).

To the extent that Bias contends that this issue may be addressed for the first time on appeal because he was given a longer sentence than he would have received had he been sentenced under the indecency statute, *see Azeez*, 248 S.W.3d at 194 (observing that claim that defendant was punished more severely under Penal Code than "he could have been under the Transportation Code" is defect in judgment that may be presented for first time on appeal), we note that Bias was sentenced to seventeen years' imprisonment for each conviction and that this sentence falls within the statutory range for the second-degree-felony offense of indecency with a child. *See* Tex. Penal Code § 21.11(d); *see also id.* § 12.33 (explaining that punishment range for second-degree felony is two to twenty years). Similarly, although the trial court ordered Bias's aggravated-sexual-assault sentences to be served consecutively, the trial court would have had that option if Bias had been sentenced under the indecency statute. *See* Tex. Code Crim. Proc. art. 42.08 (providing that trial court has "the discretion" to order sentences be served consecutively or concurrently); *Nicholas v. State*, 56 S.W.3d 760, 765 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd) (explaining that "so long as the law authorizes the imposition of cumulative sentences, a trial judge has absolute discretion to stack sentences"); *see also* Tex.

13

Penal Code § 3.03(b) (providing that if defendant is found guilty of more than one offense arising out of same criminal episode, sentences may run concurrently or consecutively if each sentence is for conviction of sexual crime, including indecency with child).

For these reasons, we conclude that Bias failed to preserve his in pari materia claim for appellate consideration and, therefore, overrule his second issue on appeal.

## CONCLUSION

Having overruled Bias's two issues on appeal, we affirm the trial court's judgments of conviction.

_____
Thomas J. Baker, Justice

Before Chief Justice Byrne, Justices Baker and Kelly

Affirmed

Filed:   September 1, 2021

Do Not Publish

14